UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02849-RPM

**HARRY SCHECK and TERRY SCHECK,**

**Plaintiffs,**

v.

**ERB OPCO SAV, LLC, dba ST. ANDREWS VILLAGE, BROOKDALE SENIOR LIVING INC., and ESLP MANAGEMENT, LLC**

**Defendants.**

_____

**AMENDED COMPLAINT
AND JURY DEMAND**
_____

COME NOW the Plaintiffs Harry Scheck and Terry Scheck, by and through their undersigned counsel, and for their Amended Complaint against Erb Opco Sav LLC dba St. Andrews Village ("St. Andrews") and ESLP Management, LLC ("ESLP"), allege and state as follows:

**JURISDICTION AND VENUE**

1.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and there is complete diversity between Plaintiffs and Defendants.

2.   Defendants committed the acts complained of herein, in significant part, in the State of Colorado at St. Andrews Village, 13801 E Yale Ave, Aurora, CO 80014. This Court has *in*

*personam* jurisdiction over Defendant pursuant to Colorado's Long Arm Statute, Colo. Rev. Stat. 13-1-124.

3. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in Colorado. Plaintiffs suffered harm in Colorado that was directly and proximately caused by Defendants' negligence as alleged herein. The subject property where the acts of Defendant occurred is located in Aurora, Colorado. Most of the parties with knowledge of the facts relating to the incident reside in Colorado.

## THE PARTIES

4. Plaintiff s incorporate by reference all preceding paragraphs of this Complaint as if fully set forth here and further allege as follows:

5. Plaintiff Harry Scheck is a natural person residing at 3621 S. Fairplay Way, Aurora, CO 80014, is a surviving child of Leah Scheck, deceased and a personal representative of the Estate of Leah Scheck, deceased.

6. Plaintiff Terry Scheck is a natural person residing at 3901 S. Walden St., Aurora, CO 80013, is a surviving child of Leah Scheck, deceased and a personal representative of the Estate of Leah Scheck, deceased.

7. Defendant Erb Opco Sav LLC, dba St. Andrews Village, is a Delaware limited liability company with its principal place of business at 2670 S Abilene Street, Aurora, CO 80014.

8. Defendant ESLP Management, LLC is a Delaware limited liability company with its principal place of business at 111 Westwood Place, Suite 300, Brentwood, TN 37027.

## RELEVANT FACTS

9. Plaintiffs incorporate by reference all preceding paragraphs in this Complaint as if fully set forth here and further allege as follows:

10. In early 2014, Leah Scheck, then 97 years of age, using oxygen therapy, but otherwise healthy, was living on her own at 867 Iola St., Aurora, CO 80010, where she had lived for the past 55 years.

11. At about that time in early 2014, Leah and her family began to discuss assisted living options for her at a facility where she could have access to help with her day-to-day living needs yet be close to her family.

12. As part of her search for an assisted living facility that would provide the type and quality of care she required, located near her family, Leah and her family visited the St. Andrews Village website at www.standrewsvillage.us. The family also reviewed printed brochures from St. Andrews Village.

13. Additionally, Leah and her family were attracted to St. Andrews Village by the radio testimonial of KOA Radio personality Mike Rosen, who professed that his parents were resident at St. Andrews Village and that St. Andrews was a "wonderful and modern facility with a well-trained staff of caring professionals."

14. During their time spent at the St. Andrews Village website, Leah and her family read and relied upon the Defendants' representation that as a resident of Defendants' Long Term Nursing Program, "You'll never have to worry about who will take care of you in the future.  That means ultimate peace of mind for you and your family."

15. During their time spent at the Defendants' website, Leah and her family read and relied upon the Defendants' representation that their Long Term Nursing Program provides "…care

that offer[s] residents just the right amount of assistance with personal care, medication, bathing and dressing provided by a caring 24-hour staff…"

16. During their time spent at the Defendants' website, Leah and her family read and relied upon the Defendants' following specific representations that the Defendants' Long Term Nursing Program provides these services to residents:

   a. Licensed nurse on duty 7 days a week;

   b. Assisted Living Director is a Registered Nurse;

   c. Full-time Resident Services Director assists with social, emotional and recreational needs;

   d. On-site Wellness Coordinator; and,

   e. Residents have priority access to our Healthcare Center

17. Leah and her family read and relied upon Defendant's statements in their printed brochures that, St Andrew's Village provides "high-quality care for a high quality life;" that St. Andrews Village, "insure(s) our guests receive the personalized attention they deserve;" that "our goal is to provide the therapy and medical care necessary to expedite your recovery and return to home;" and, that "our rehabilitation team is dedicated to providing quality care with dignity and respect."

18. On March 14, 2014, Leah Scheck, with the help of her family, moved into St. Andrews Village and became a resident of Defendants' Assisted Living program at St. Andrews Village.

19. Prior to and upon Leah's arrival at St. Andrews, Defendants' employee Sarah Petersen Warren and several members of the St Andrews' staff told Leah's family "not to worry, we will take good care of your Mom."

20. At the time Leah became a resident of St. Andrews on March 14, 2014 she could walk with the aid of a walker, go to the bathroom, get in and out of bed, and occasionally wash dishes while standing at the sink; the Defendants stated that Leah would receive "restorative PT" which would help strengthen Leah's legs.

21. However, within a week after becoming a St. Andrews' resident, Leah was wheel chair bound, being moved with a lift and not receiving the "restorative PT" promised by the Defendants.

22. Rather than improve, Leah's mobility continued to deteriorate to the point where she was forced to use a bed pan rather than the bathroom facilities.

23. With her mobility restricted to the bed and wheelchair and no longer able to use the bathroom facilities, Leah was dependent upon the bed-side "call button." Unfortunately, Leah's call button was non-functioning for almost two weeks following the start of her residency making it nearly impossible to summon help when Leah needed to use the bathroom facilities.

24. On March 18, 2014, Leah's son, Harry Scheck, was visiting during lunch when he noticed Leah could barely lift her hand to feed herself. Leah told Harry, "I can't get enough air." Harry summoned help from Defendants' PT Director, Lance Rendle, who realized that Leah's oxygen therapy tank was empty; Leah was suffocating.

25. Again, on March 20, 2014, during a visit, Leah's sons Harry Scheck and Terry Scheck found Leah's oxygen tank empty; Leah was suffocating. They met personally with Defendants' facility administrator Carl Zarlengo and Social Services Director Meredith McVeigh and Mr. Zarlengo and Ms. McVeigh each personally guaranteed Harry Scheck and Terry Scheck that the Defendants' failures to maintain Leah's oxygen tank level would be immediately addressed and that the problem "would not happen again."

26.     On or about March 31, 2014, Leah developed congestive heart failure and was taken for treatment at University Hospital, where she remained until April 8, 2014.

27.     After Leah's return to Defendants' St. Andrews Village Long Term Nursing Program in early April 2014, Leah and a fellow resident, Ruth Cunningham, told Harry Scheck and Terry Scheck about the "Waiting Game." Leah and Ruth Cunningham had personally observed the St. Andrews' staff engage in conduct to ration staff time by intentionally making residents wait for assistance, for example, to use the bathroom facilities. Sadly, some residents were made to wait so long that they soiled themselves. Leah and Ruth Cunningham had personally observed the staff in the facility's hallways, texting, laughing and kidding about the "Waiting Game."

28.     During the evening of May 7, 2014, during his evening visit with his Mother, Harry Scheck observed that while Leah's nasal cannula was in place, it was not connected to the oxygen tank; Defendants' employee "Aywa" had failed to connect the oxygen supply when she put Leah to bed. Again, Leah was suffocating.

29.     On May 9, 2014 Harry Scheck and Terry Scheck again met with Defendants' Carl Zarlengo and Meredith McVeigh about Defendants' chronic failure to appropriately care for Leah. On this occasion, Harry and Terry brought the matter of Defendants' Staff playing the "Waiting Game" with residents; neither Zarlengo nor McVeigh appeared surprised to hear about the "Waiting Game."

30.     The next evening, May 10, 2014, Leah was experiencing diarrhea and needed assistance with toileting. Harry Scheck attempted to obtain assistance for Leah by using her call button but no one responded. Harry then asked Defendants' employee Kathy Johnson for assistance with Leah's needs but she refused stating that "the lift was broken" and not available to move residents. When Harry again asked Kathy Johnson for help with Leah, she again refused. Harry

and Terry Scheck then attempted to assist Leah but it was too late, she had soiled herself. Harry and Terry then asked for help getting Leah to the shower; on this occasion, Kathy Johnson replied that Defendants "did not have enough help."

31.     During their evening visit on May 29, 2014 Leah was in good spirits and talkative, telling her sons Harry Scheck and Terry Scheck that she loved them; Leah had a slight non-productive cough that evening that they reported to Kathy, the nurse on duty who said she would call Leah's primary care doctor Dr. Delosreyes.

32.     At 7:15 a.m. on May 30, 2014, Leah requested to go to the bathroom; two full portable O2 tanks were present. At 7:30a.m., after toileting, Leah was put back in bed. Ten minutes passed. At 7:40a.m., M. Remy, LPN, checked on Leah and found her unresponsive. Defendants' nurse on duty that morning, Maria, called Harry Scheck to tell him that Leah was dead. In response to Harry's question whether a "911 call" had been placed, Maria again replied "she is dead."

33.     Upon their arrival at St. Andrew Village, Harry and Terry were called by Ruth Cunningham, the resident in the room directly across from Leah, to come over to her room. Ruth Cunningham told them that there was a lot of commotion over at Leah's room at about 7:30 a.m. and that she heard Leah calling out and crying for help.

## FIRST CLAIM FOR RELIEF
### (Negligence as to all Defendants)

34.     Plaintiffs incorporate by reference all preceding paragraphs in this Complaint as if fully set forth here and further alleges as follows:

35.     Defendants owed Leah Scheck, and thus by extension, the Plaintiffs, a duty of due care commensurate with all common law duties and standard of care, including:

    a.  The duty to see and adequately and appropriately assess Leah Scheck's medical condition;

    b.  The duty to order appropriate tests for the diagnosis of Leah Scheck's condition;

    c.  The duty to treat all emergent conditions, including Leah Scheck's oxygen therapy needs;

    d.  The duty to assess and evaluate symptoms and changes of condition communicated by Leah Scheck and her family members;

    e.  The duty to promptly and reasonably respond to calls for emergent treatment made by Leah Scheck and her family members.

36.    Defendants breached their duty of due care by engaging in the acts and omissions described herein and by:

    a.  Refusing to respond to Leah Scheck's medical needs;

    b.  Abandoning Leah Scheck;

    c.  Refusing to listen to the requests and demands of Leah Scheck's family;

    d.  Providing care that was below accepted standards;

    e.  Failing to promptly respond to Leah Scheck's medical needs;

    f.  Negligent diagnosis and care of Leah Scheck's medical condition.

37.    The acts and omissions described herein resulted in Leah Scheck's wrongful death.

38.    As a direct, immediate and proximate result of the Defendants' negligence as stated above, Leah Scheck died and the Plaintiffs have sustained severe injuries which has caused the Plaintiffs great pain, suffering, discomfort and emotional distress and which will continue to cause the Plaintiffs great pain, suffering, discomfort and emotional distress.

39.    As a direct, immediate and proximate result of the Defendants' negligence, Leah Scheck died and the Plaintiffs have incurred medical, therapeutic, hospital and physician expenses.

40. All damages to the Plaintiff s are in the past, present and future whether so specifically delineated in each paragraph or not.

## SECOND CLAIM FOR RELIEF
### (Extreme and Outrageous Conduct As Against all Defendants)

41. Plaintiff incorporates by reference all preceding paragraphs in this Complaint as if fully set forth here and further allege as follows:

42. Defendant acted in an extreme and outrageous fashion by:

   a. Ignoring Leah Scheck's medical needs;

   b. Making Leah Scheck wait for necessary medical and personal care and attention as part of Defendants' employees "Waiting Game;"

   c. Repeatedly refusing to monitor and maintain the necessary levels of oxygen supply for Leah Scheck's oxygen therapy resulting in Leah Scheck nearly suffocating on more than one occasion and ultimately leading to her death on May 30, 2014;

   d. By failing to respond in a timely fashion in an obvious medical emergency and obtain medical care for Leah Scheck;

   e. By retaining persons on staff who are known to be dangerous to and disinterested in the wellbeing of patients and patient care.

43. As a direct, immediate and proximate result of the Defendants' extreme and outrageous conduct as stated above, Leah Scheck dies and the Plaintiffs have sustained severe injuries which have caused the Plaintiff s great pain, suffering, discomfort and emotional distress and which will continue to cause the Plaintiffs great pain, suffering, discomfort and emotional distress.

44. As a direct, immediate and proximate result of the Defendants' extreme and outrageous conduct, Leah Scheck died and the Plaintiffs have incurred and will continue to incur medical, therapeutic, hospital and physician expenses.

45. All damages to the Plaintiffs are in the past, present and future whether so specifically delineated in each paragraph or not.

## THIRD CLAIM FOR RELIEF
### (Violation of the Colorado Consumer Practices Act As Against All Defendants)

46. Plaintiff incorporates by reference all preceding paragraphs in this Complaint as if fully set forth here and further allege as follows:

47. At all times material to the allegations in this Complaint, Defendants were engaged in the business of marketing, promoting, advertising, and/or selling their assisted living home residencies and services.

48. Defendants have a statutory duty to refrain from unfair competition, consumer fraud, and/or unfair and deceptive acts and practices in the advertisement, promotion, sale of their services.

49. Defendants began marketing, advertising, promoting and selling their assisted living home residencies and services in at least 2011 via website advertising and promotion and direct to consumer marketing, advertising, promotion and sales using various printed materials and radio advertising describing and promoting their residencies and services.

50. Defendants engaged in unfair, deceptive, fraudulent, and misleading acts and/or practices in violation of C.R.S. § 6-1-105.

51. In violation of C.R.S. § 6-1-105, in the normal course of business, Defendants misrepresented the alleged benefits and characteristics of their residencies and services; suppressed, omitted, concealed, and failed to disclose material information concerning their residencies and services; misrepresented and advertised that their residencies and services were of a particular standard, quality, or grade that they were not; misrepresented that their residencies

and services had certain characteristics, uses, or benefits; and otherwise engaged in fraudulent, deceptive, and unfair acts and practices.

52. In violation of C.R.S. § 6-1-105, Defendants made fraudulent and intentional misrepresentations, omissions, and/or concealments of material facts regarding their residencies and services in advertising, marketing, promotions, and publications, including in the following particulars:

   a. Defendants misrepresented that they provide a secure and homelike environment for residents;

   b. Defendants misrepresented that their homelike environment and trained, caring staff will help to reduce confusion and provide support for residents and their loved ones;

   c. Defendants misrepresented that they provide personal assistance with the activities of daily living when residents are no longer capable of providing for themselves and require more care than family members can provide.

   d. Defendants misrepresented that they are a less expensive and more homelike alternative to placement in a nursing home;

   e. Defendants misrepresented that they provide personal assistance with the activities of daily living for those who are no longer capable of providing for themselves and require more care than family members can provide and that Defendants provide a less expensive and more homelike alternative to placement in a nursing home;

   f. Defendants misrepresented that they coordinate the services of other health care providers for each resident, administer or supervise medication and provide 24-hour monitoring to ensure resident health, safety, and well-being;

   g. Defendants misrepresented that they provide "high-quality care for a high quality life;"

    h. Defendants misrepresented that they "insure our guests receive the personalized attention they deserve;"

    i. Defendants misrepresented that "our goal is to provide the therapy and medical care necessary to expedite your recovery and return to home;" and,

    j. Defendants misrepresented that "our rehabilitation team is dedicated to providing quality care with dignity and respect."

53. Defendants' conduct misled, deceived, and damaged Leah Scheck and the Plaintiffs, and Defendants' fraudulent, misleading, deceptive, and unfair conduct was intended to induce Leah Scheck and the Plaintiffs into reasonably relying on said conduct by purchasing Defendants' assisted living residency and services to Leah Scheck's and the Plaintiff's detriment.

54. Moreover, Defendants knowingly took advantage of Leah Scheck and the Plaintiffs, who were reasonably unable to protect their interests due to Leah Scheck's and Plaintiff's lack of knowledge of the truthfulness of Defendants' representations concerning the Defendants' ability to provide the level of assistance represented.

55. As a result of Defendants' conduct described herein, Leah Scheck and the Plaintiffs reasonably and/or justifiably relied upon Defendants' conduct and purchased an assisted living residency and services from the Defendants.

56. Defendants' conduct was willful, immoral, unethical, oppressive, outrageous, unconscionable, and substantially injurious to users and consumers, including Leah Scheck and the Plaintiffs, and to the general public. Defendants' conduct, described herein, significantly impacts the public, including actual and potential consumers, and, therefore, offends the public conscience.

57.     By means of the above-described deceptive trade practices, Defendants have unlawfully acquired money from numerous Colorado residents, including Leah Scheck and the Plaintiffs.

58.     As a result of Defendants' conduct and misrepresentations, omissions, and/or concealments, Plaintiffs have suffered significant and persistent and/or permanent injuries.

59.     The deceptive trade practices occurred in the course of the Defendants' business, vocation or occupation.

60.     The deceptive trade practices were uniform and consistent and significantly impacted the public as actual or potential consumers of the Defendants' goods and services.

61.     The Defendants engaged in bad faith conduct consisting of fraudulent, willful, knowing and/or intentional conduct.

62.     As a direct and proximate result of the Defendants' deceptive trade practices and their violation of Colorado's Consumer Protection Act, the Plaintiffs sustained losses.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**.

**WHEREFORE**, Plaintiffs pray for compensatory damages in favor of the Plaintiff and against the Defendants in an amount to be determined by the trier of fact, treble damages for Defendants' violation of the Colorado Consumer Protection Act together with attorneys' fees pursuant to C.R.S. §6-1-113, pre-judgment interest, post-judgment interest, expert witness fees, filing fees, attorney fees, deposition expenses, and for such other and further relief as this Court may deem appropriate, including all costs.

Dated this 21st day of October, 2014.

                                         *s/ Theodore E Laszlo, Jr.*

                                         Theodore E Laszlo, Jr., #36234
                                         Michael J. Laszlo #
                                         LASZLO & ASSOCIATES, LLC
                                         2595 Canyon Boulevard
                                         Suite 210
                                         Boulder, CO 80302
                                         303-926-0410 (phone)
                                         303-443-0758 (fax)
                                         tlaszlo@laszlolaw.com
                                         mlaszlo@laszlolaw.com

                                         **ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing AMENDED COMPLAINT AND JURY DEMAND was served this 21st day of October, 2014 electronically upon all counsel of record via the court's electronic filing system.

*s/ Theodore E Laszlo, Jr.*_____
Theodore E Laszlo, Jr.